UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROBERT L. ALDAG,
        Plaintiff,

    v.                            Case No. 04C0939

ALDAG/HONOLD MECHANICAL, INC.,
        Defendant.

## DECISION AND ORDER

Plaintiff Robert L. Aldag brings this action alleging that defendant Aldag/Honold Mechanical, Inc. ("AH") violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., by firing him because he was sixty years old. Defendant now moves for summary judgment.

## I. FACTS

AH is a mechanical contractor in Sheboygan, Wisconsin engaged in the business of designing and installing piping, heating, ventilation, air conditioning and metal fabrication in commercial, industrial and residential buildings. AH hired plaintiff in 1993 when he was fifty years old to work as a project manager in its plumbing and pipe fitting division. Plaintiff's principal experience was as a plumber, and he had a master plumbers license.

AH expected project managers to bring in work and manage projects profitably. In the years after 2001, AH struggled financially and asked all its employees to focus on increasing sales.

In July 2002, AH's president David Aldag and treasurer Alan Dvorak conducted plaintiff's 2002 performance evaluation.[1]  They stated in his evaluation that "sales are lagging peer group," and that "computer training" was a goal for the future.  (Def.'s Reply to Pl.'s Resp. to Def.'s Proposed Findings of Fact & Conclusions of Law (hereinafter "Reply") ¶ 33.)  Prior to his evaluation, plaintiff's sales had trended downward:  in fiscal year 2000, they were $715,064.97; in fiscal year 2001, $369,214.76; and in fiscal year 2002, $255,844.68.

In 2002 or 2003, Joe Noll, a foreman plaintiff supervised, complained to David Aldag, stating that he was contemplating quitting his employment at AH because plaintiff did not provide him with adequate support and supervision.

In October 2002, AH employed three project managers in its plumbing and pipe fitting division:  plaintiff, who was then age fifty-nine; John Davis, age fifty; and Jerry Battaglia, age sixty-one.  At that time, David Aldag and Dvorak decided that based on the division's sales they could no longer afford to keep three managers in the division, so they terminated Davis.  David Aldag and Dvorak met with plaintiff on October 4, 2002 to tell him of their decision.  They state that they also told plaintiff that he needed to be more efficient by using cell phones and a computer, and that if the division's sales and profits did not increase, they would make changes including possibly discharging him.  Plaintiff disputes that Aldag and Dvorak made these statements to him.

In April 2003, Dvorak overheard an employee ask the receptionist where plaintiff was, and when she said that he was at a job site, the employee used the expression

---

[1]Plaintiff is a cousin of David Aldag's father.

2

"windshield time," a derogatory phrase referring to spending excessive time in one's car. (Reply ¶ 44.) After hearing that comment, Dvorak noticed that plaintiff left the building every morning at approximately the same time and thought this odd because he believed that project managers primarily used cell phones and e-mail to monitor projects. Thus, Dvorak decided to follow plaintiff to determine whether he was spending windshield time.

On May 15, Dvorak followed plaintiff, observed him intermittently and concluded that he wasted a considerable amount of time. Of the time that Dvorak observed him, plaintiff spent some time on work-related matters including twenty-six minutes at City Hall, fourteen minutes traveling to and from City Hall, and nine minutes on a phone call to a supplier. However, Dvorak observed that plaintiff spent about thirty minutes not doing anything related to work, and he concluded that this was an excessive amount of unproductive time. Dvorak discussed his observations and conclusion with David Aldag, and they decided to continue to follow plaintiff occasionally.

On May 16, plaintiff left the office at 8:54 a.m. and advised the receptionist that he was going to the Koepsell Company ("Koepsell"), a plumbing wholesaler 2.7 miles from the office, and that he would be back by 10:00 a.m. David Aldag followed plaintiff and observed him intermittently. He saw plaintiff go to a McDonald's and a mini-mart. David Aldag went to Koepsell to determine whether plaintiff had gone there and concluded that plaintiff never showed up at Koepsell. David Aldag believed that plaintiff did not engage in any work-related activities while out of the office on May 16. Plaintiff does not deny that he never showed up at Koepsell nor does he identify any work that he performed that David Aldag did not observe.

On May 19, 2003, plaintiff told the receptionist that he was going to the J. L. French job site, 1.3 miles from the office. Dvorak followed him and noted that plaintiff was out of the office from 7:33 a.m. until 9:12 a.m. Dvorak states that during most of that time, plaintiff drove around at a pace well under the speed limit in an area where there were no AH job sites. Dvorak states that plaintiff appeared at the J. L. French site for less than six minutes. Dvorak concluded that plaintiff spent about fifty minutes of his time out of the office engaged in non-work-related activities. Plaintiff does not deny that he spent less than six minutes at the J. L. French site and does not identify any work that he performed that Dvorak did not observe.

On May 22, plaintiff left the office at 7:53 a.m. to go to the J. L. French job site and to the nearby Lakeland job site. Dvorak observed plaintiff intermittently from the time he left the office until 11:27 a.m. or for about 3.4 hours. During this time, Dvorak observed plaintiff spend one hour and twenty-one minutes at job sites and the rest of the time driving slowly, sitting in his parked car and stopping at two different McDonald's and two different mini-marts. Dvorak concluded that of his time out of the office on May 22, plaintiff spent over two hours unproductively. Plaintiff does not identify any work that he performed that Dvorak did not observe. Dvorak considered the possibility that plaintiff took an early lunch but noted that after returning to the office, plaintiff signed out for lunch from 12:00 noon to 1:10 p.m.

On May 27, Dvorak observed plaintiff intermittently from 8:50 a.m. until 10:02 a.m. During that time, plaintiff did not stop at any job sites but did stop for four minutes at a supplier. Dvorak concluded that of his time out of the office, plaintiff spent over an hour

4

unproductively. Plaintiff does not identify any work that he performed that Dvorak did not observe.

Dvorak reviewed plaintiff's phone records for the above dates to determine whether plaintiff made work-related calls while out of the office. The phone logs indicated that plaintiff made three work-related calls on May 22 amounting to nine minutes and no others.

David Aldag and Dvorak state that they concluded that plaintiff was spending more time unproductively than AH could tolerate. They state that in deciding whether to discharge plaintiff they also considered his declining sales performance. On June 20, 2003, they discharged plaintiff. They did not then tell plaintiff that the reason for the discharge was his unproductive use of time but said only that AH was going in a different direction. They state that they said this because of plaintiff's family connection to David Aldag and because they did not want to hurt his prospects for getting another job. They indicated on the form that AH provided to plaintiff's union that the reason for the termination was a reduction in force. Only after plaintiff commenced the present suit did David Aldag and Dvorak state that they fired him for unproductive use of time.

On June 2, 2003, James Moylan, age thirty-nine, commenced employment as a project manager in the plumbing and pipe fitting division. The record does not indicate the date that AH hired Moylan. David Aldag and Dvorak state that a headhunter brought Moylan to their attention and that they hired him because of his experience in pipe fitting, which they thought would complement plaintiff's and Battaglia's strength on the plumbing side. They further state that they had decided to have three project managers in the division and hoped that improvement on the piping side would increase overall profitability.

5

They state that when they hired Moylan, they told him that he would join two other project managers.

When AH fired plaintiff, it assigned his projects to Battaglia and Moylan.

I will state additional facts in the course of the decision.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." <u>Id.</u>

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, <u>Anderson</u>, 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. <u>Id.</u> at 248.

The moving party bears the initial burden of demonstrating that it is entitled to judgment as a matter of law. <u>Celotex Corp.</u>, 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the non-moving party's case, the moving party may satisfy its initial burden simply by

6

pointing out the absence of evidence. Id. at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. Id. at 322-23. Neither party may rest on mere allegations or denials in the pleadings, Anderson, 477 U.S. at 248, or upon conclusory statements in affidavits, Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572 (7th Cir. 1989). In considering a motion for summary judgment, I may consider any materials that would be admissible or usable at trial, including properly authenticated and admissible documents. Woods v. City of Chicago, 234 F.3d 979, 988 (7th Cir. 2000).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record — only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

### III. DISCUSSION

The ADEA bars employers from discriminating against employees who are forty or older. 29 U.S.C. §§ 621(b) and 631(a). An ADEA plaintiff must establish that his employer treated him adversely because of his age. Cengr v. Fusibond Piping Sys. Inc., 135 F.3d 445, 451 (7th Cir. 1998). A plaintiff may prove age discrimination either by presenting direct evidence of discrimination or by relying on the burden-shifting method formulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the burden-shifting approach, the employee must first establish a prima facie case of discrimination. To do this, he must show that (1) he was a member of the protected class (age forty or over); (2)

7

he was doing his job well enough to meet his employer's legitimate expectations; (3) he was discharged or demoted; (4) under circumstances giving rise to an inference of age discrimination as, for example, by being treated less favorably than a similarly situated younger employee. Cengr, 135 F.3d at 451.[2]

Once the plaintiff makes out a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the discharge. If the employer articulates such a reason, the burden shifts back to the employee to show that the employer's proffered reason is a pretext for age discrimination. Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122 (7th Cir. 1994). However, a court should not engage in a pretext analysis unless the plaintiff first establishes all of the elements of the prima facie case, including that he was meeting the employer's "legitimate expectations." Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1179 (7th Cir. 1997). Only if the plaintiff demonstrates that the employer's legitimate expectations were themselves pretextual should a court merge the legitimate expectations and pretext analyses. Id.; see also Brummett v. Lee Enters., Inc., 284 F.3d 742, 744 (7th Cir. 2002).

In the present case, it is undisputed that plaintiff satisfies the first and third elements of the prima facie case, i.e., that he was over forty and discharged. However, AH argues that plaintiff fails to establish a prima facie case because he fails to satisfy the second and fourth requirements – that he was meeting his employer's legitimate expectations and that he was treated less favorably than a similarly situated younger employee. I conclude that

---

[2]The Seventh Circuit has employed various formulations for the fourth element of the prima facie case largely because of the different types of age discrimination. Cengr, 135 F.3d at 451 n.1.

8

plaintiff fails to show that he was meeting AH's legitimate expectations and that he therefore fails to establish a prima facie case. I also conclude that the record does not support a reasonable inference that AH's expectations were phony. Therefore, I need not address the fourth element of the prima facie case or engage in a pretext analysis.

The phrase "legitimate expectations" simply means bona fide expectations, for it is no business of a court in a discrimination case to decide whether an employer demands "too much" of its workers. Coco, 128 F.3d at 1179. An employer's expectations are bonafide if the employer makes them in good faith and without fraud or deceit. Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1089 (7th Cir. 2000). In the present case, David Aldag and Dvorak state that plaintiff failed to satisfy their expectation that he spend his time at work engaged in productive work-related activities and that he improve his lagging sales performance.

David Aldag and Dvorak state that AH expected its employees to attend to business matters when they were at work and that it did not wish to pay employees for driving around aimlessly, sitting in their cars, and spending excessive time at McDonald's and mini-marts. They further state that AH expected project managers to focus on sales. In addition, they had advised plaintiff in his last performance evaluation that his sales were lagging. David Aldag and Dvorak also state that AH expected an employee who advised the receptionist that he was going someplace to actually go there instead of leaving the building and wasting time. Nothing in the record suggests that these were not AH's actual expectations or that they were in anyway illegitimate.

Further, AH presents a substantial amount of evidence indicating that prior to his discharge plaintiff was not meeting such expectations. The record indicates that plaintiff

9

spent much of his time out of the office engaged in non-productive activities such as driving around, sitting in his parked car and going to McDonald's and mini-marts. Based on their observations, David Aldag and Dvorak concluded that plaintiff spent more than half of his time out of the office engaged in such pursuits. In fact, in one three hour span on May 22, 2003, plaintiff spent almost two hours wasting time. He drove around and went to two McDonald's and two mini-marts. To make matters worse, he then returned to the office for a half hour before taking an hour and ten minute lunch break. In addition, on some occasions, plaintiff advised the receptionist that he was going to a particular place but did not show up there. And on several occasions, plaintiff went to a job site or a supplier but spent as little as six minutes there.

David Aldag and Dvorak considered plaintiff's unproductive use of time to be particularly serious because other employees had previously advised them that plaintiff was not performing his job well and because plaintiff's sales performance had worsened over the past three years. Joe Noll, a foreman who plaintiff supervised, told David Aldag that he was contemplating quitting his job because plaintiff provided so little support. And David Aldag and Dvorak followed plaintiff because an employee suggested that plaintiff was spending too much windshield time. Plaintiff's last performance evaluation stated that his "sales [were] lagging [when compared with his] peer group." (Reply ¶ 33.)

Plaintiff makes several arguments in response to AH's claim that he performed deficiently, none of which are persuasive. First, plaintiff argues that because he received a salary, "it was not necessary for [him] to account for what he spent his time doing but only the result of his labors." (Pl.'s Br. at 9-10.) However, AH surely had a right to expect that plaintiff would not spend substantial amounts of his time driving around and going to

10

McDonald's. Moreover, plaintiff presents no evidence suggesting that the "result of his labors" justified overlooking his unproductive use of time. He presents no evidence, for example, that he had improved his sales performance.

Plaintiff next argues that David Aldag and Dvorak did not observe him continuously when they followed him. However, he identifies no work that he performed on the days that they followed him for which they did not give him credit in calculating the time that he spent productively.

Plaintiff also argues that he worked for AH for ten years and that he performed well over the years, and at one time solved some employee discipline problems. However, an employer's expectations are measured as of the time that the employer discharges the employee. Grohs v. Gold Bond Bldg. Prods., 859 F.2d 1283, 1287 (7th Cir. 1988); see also Anderson v. Stauffer Chem. Co., 965 F.2d 397, 401 (7th Cir. 1992) (stating that "what matters is whether [the plaintiff] was meeting his employer's expectations at the time of his discharge"). Thus, his good performance in the past is irrelevant.

Finally, plaintiff argues that AH did not advise him of his poor performance. However, AH gave him notice of his declining sales performance, and it did not become aware of his unproductive use of time until shortly before his discharge when David Aldag and Dvorak followed him.

Thus, plaintiff fails to present sufficient evidence to create a genuine issue of material fact that he was meeting AH's legitimate expectations at the time that it discharged him. Therefore, he fails to establish a prima facie case as required by the McDonnell Douglas burden-shifting formula. Nor can I reasonably infer from the record that AH's expectations of plaintiff were not bonafide. As previously indicated, it is not my business

11

to say when an employer demands too much of its workers. <u>Coco</u>, 128 F.3d at 1179. And even if it were, I could not say in the present case that AH demanded too much of plaintiff. It is surely legitimate for an employer to expect an employee to spend most of his time at work engaged in work activities. This is all the more true when the employee is supposed to be focusing on sales and when his sales performance is lagging. Plaintiff suggests that I may infer from AH's hiring of Moylan that its expectations of him were not bonafide. However, plaintiff presents no evidence that AH's expectations of him were pretextual, and the fact that it hired Moylan is insufficient to create a genuine issue of material fact that they were. Thus, I decline to conduct a pretext analysis in conjunction with my analysis of the legitimate expectations prong of the prima facie case. <u>Id.</u>; see also <u>Brummet</u>, 284 F.3d at 749.

### III. CONCLUSION

Therefore, for the reasons stated,

**IT IS ORDERED** that defendant's motion for summary judgment is granted, and this case is **DISMISSED.**

Dated at Milwaukee, Wisconsin this 20 day of December, 2005.

/s_____
LYNN ADELMAN
District Judge

12